UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Veeam Software Corporation,

      Plaintiff,

      v.

Keeley Monckton,

      Defendant.

Case No. 2:16–cv–379

Judge Michael H. Watson

Magistrate Judge Jolson

## OPINION AND ORDER

Veeam Software Corporation[1] ("Veeam" or "Plaintiff") filed the instant action seeking to enjoin Keeley Monckton ("Ms. Monckton" or "Defendant") from continuing her employment with Rubrik, Inc., a Veeam competitor in the virtualized backup and recovery software business. Verified Compl., ECF No. 2. Veeam moved for a temporary restraining order ("TRO") and a preliminary injunction. ECF No. 1-3. This case was originally filed in the Court of Common Pleas for Franklin County, Ohio, which issued a TRO prohibiting Defendant from working at Rubrik. ECF No. 1-18. The case was thereafter removed to this Court, and the parties stipulated to the TRO's extension until the earlier of May 27, 2016 or the date of the preliminary injunction hearing. The Court held a hearing on Plaintiff's motion on Monday, May 23, 2016.

---

[1] Veeam is in the back-up and recovery software business. PI Hearing Trans. 7, ECF No. 36 (Lando). Its product takes images of a computer's hard drive, which it either stores on a disk or sends to a cloud service. *Id.* At the hearing, Veeam's current employees heralded its product as providing a simplified and fast recovery software, with less hardware than its competitors. *See id.* at 7–8.

## I.    FACTS

### A. Background

Ms. Monckton is a single mother who lives in Chicago.  Monckton Decl. ¶ 4, ECF No. 15-1.  Her experience in the sales industry started in direct end-user sales, followed by a position as a national channel manager with Barracuda Networks, Inc. ("Barracuda") that she held from May 2013 to February 2015. *Id.* ¶ 5.

Thereafter, she joined Veeam as one of six or seven members of the channel team where she worked as a channel manager with CDW, Inc. ("CDW")[2]. *Id.* ¶¶ 8, 14. Upon joining Veeam, Ms. Monckton signed an Employment Agreement that provided, in part:

> Non-Competition. Employee is prohibited from engaging in unfair competition with Veeam both during and after employment as follows:
>
> a. The term "Competing Business" means any person or entity that directly or indirectly designs, manufactures, creates, distributes, supplies, sells, re-sells, promotes, markets, offers, or is otherwise directly or indirectly involved with any good or service that is competitive in any way with any good or service designed, manufactured, created, distributed, supplied, sold, re-sold, promoted marketed, or offered by Veeam.
>
> b. The term "Protected Area" means all of North America, which constitutes the geographic area in which Veeam's North American Operations competes with its goods and services.

---

[2] CDW is a company that takes individual company's products and packages them with other company's products to create a portfolio to then sell to end users.  Through this model, Veeam and Rubrik do not sell to end users; rather, they attempt to obtain "mind share" of CDW, and similar companies, so that the resellers use their products in the portfolios.

c. The term "Compete" means (a) to in any way work for a Competing Business and/or (b) to assist a Competing Business in any way with any good or service that is competitive with any good or service designed, manufactured, created, distributed, supplied, sold, re-sold, promoted, marketed, or offered by Veeam. Employee "competes" regardless of whether Employee works for or assists through acts or omissions.

. . . .

**d. Employee agrees that during employment with Veeam and for a period of one (1) year thereafter regardless of the reasons for termination. Employee will not, on Employee's own behalf, or as a partner, member, employee, agent, officer, director equity holder, consultant, independent contractor or joint venturer of or in any capacity with, a Competing Business compete in any way or prepare to compete in any way with Veeam in the Protected Area.**

Verified Compl., Ex. A, ECF No. 2 (emphasis added).

Ms. Monckton's employment with Veeam lasted approximately thirteen months. When she was first hired, she completed new hire training on Veeam's newest product line, including a one to one and a half hour tutorial on the products' technical aspects. *Id.* ¶¶ 10, 12.

At Veeam, Ms. Monckton organized and promoted various events for CDW representatives. *Id.* ¶ 16. She attended weekly and quarterly meetings at which sales opportunities and goals were discussed. *Id.* ¶ 13.

On March 14, 2016, Ms. Monckton accepted a job offer from Rubrik as a Channel Development Manager for the Central Region, a job that requires her to develop and maintain relationships with all of Rubik's channel partners (except for CDW) in North Dakota, South Dakota, Nebraska, Kansas, Oklahoma, Texas,

Minnesota, Iowa, Missouri, Arkansas, Louisiana, Wisconsin, and Illinois. Monckton Decl. ¶ 4, ECF No. 15-1.

Ten days later, on March 24, 2016, Ms. Monckton notified William Burgman, her supervisor at Veeam, that she was considering leaving Veeam. PI Hr'g Trans. 5, ECF No. 36 (Burgman). He offered Ms. Monckton incentives to stay with Veeam. *Id.* at 96–97. Nevertheless, Ms. Monckton resigned from her post and gave her two-week notice on March 28, 2016. *Id.* at 100.

Notwithstanding her two-weeks' notice, she started working at Rubrik four days later on April 1, 2016. *Id.* at 236 (Monckton). Shortly thereafter, Veeam filed suit seeking to enforce Paragraph 3(g) of the Employment Agreement, and on April 20, 2016, Plaintiff successfully obtained a TRO in state court prohibiting Ms. Monckton from working at Rubrik. *See* ECF No. 1-18.

### B. Testimony at the Preliminary Injunction Hearing

The Court held a preliminary injunction hearing the week of May 23rd, 2016. At the hearing, the Court heard testimony from William Burgman, Edward Lando, Keeley Monckton, and William Cordero.

#### 1. Testimony of William Burgman

William Burgman, Senior Director of Corporate Resellers at Veeam, was Defendant's supervisor at Veeam. PI Hr'g Trans. 66, ECF No. 36 (Burgman).

Mr. Burgman oversees the corporate reseller team, which is set up as a "matrix" and focuses on the top seven resellers of back-up and recovery software, and includes about forty-five employees. *Id.* at 78. Defendant was a

member of this team. *Id.* The team's goal is to keep the company at the top of the seven resellers' minds, a concept he termed "mind share." *Id.* at 10–11. The team members provide "competitive comparisons" of Veeam's products to others through Veeam handouts and other materials. *Id.* at 12.

Defendant was assigned to dominate the "mind share" of CDW's 2,600 sales representatives. *Id.* at 17. Veeam placed Defendant in one of CDW's two buildings. *Id.* at 18. Part of her job was to remain visible to CDW's sales representatives and to push deals that were part of Veeam's "pipeline." *Id.* The pipeline is a list of opportunities or deals that have legs and are already moving forward toward completion. *Id.* Burgman described the work that Defendant completed for Veeam as follows: she covered the west area that included Arizona, Colorado, and Utah in the "med-lar" space, i.e. companies with at least 200 employees; she also covered the central space when Gilbert Lowe moved up in the company. She also worked in several "vertical" areas of sales, including health care. *Id.* at 20–21. Burgman stated that Defendant was in one of the most visible and important sales position. *Id.* at 23.

Burgman testified that, to do her job effectively, Ms. Monckton attended new-hire training, weekly meetings, quarterly and annual company-wide meetings, as well as occasional on-line training, and had access to "salesforce.com" and "teamveeam.com," which included real time sales data, customer information, product guides, manuals and other Veeam educational materials. *Id.* at 30–36.

Burgman admitted that the on-line training available to Defendant was largely made available to Veeam's resellers, which amounts to roughly 10,000 companies and their employees. *Id.* at 111. Those employees could only access the trainings with a password and the reseller companies were prohibited from sharing the trainings five years after terminating any relationship with Veeam. *Id.* at 166–164 (Lando); *see also* PX 37 (Partner Enrolment Agreement). Much of the information included on the online trainings is also publicly available on Veeam's webpage. *See, e.g., id.* at 128 (Burgman).

Burgman testified that Defendant was added to the reseller representative e-mail distribution list that encompassed all of Veeam's North America region resellers. *See* PX 17; PX 18. Defendant did not create corporate strategy, set sales quotas, and rarely, if ever, communicated with end users. PI Hr'g Trans. 108, ECF No. 36 (Burgman).

Burgman described CDW as the largest reseller in North America, and Burgman stated that CDW accounts for between twenty and twenty-five percent of Plaintiff's sales. *Id.* at 36. Veeam's sales take between one week and one year to close. *Id.* at 80.

### 2. Testimony of Edward Lando

The Court also heard testimony from Edward Lando. Lando is Director of Human Resources for Veeam's America operation. *Id.* at 150 (Lando). He stated that all employees who work for Veeam must agree to the Employee Agreement that Defendant signed, in part because Veeam is internally "very

open." *Id.* at 158–59.  The one-year noncompetition condition is in place because Veeam's products change annually, and any information an employee might have acquired while working at Veeam would otherwise become stale in that amount of time.  *Id.* at 159.  The company has a strict policy regarding its information.  *Id.* at 161.  An employee must receive permission before taking any materials from Veeam offices.  *Id.*

Lando indicated that: Defendant knows Veeam's untouched markets; Defendant received the best training because she worked with Veeam's biggest partner and under Burgman; and Defendant knows Veeam's recruiting partners. *Id.* at 170–71.  Veeam did not consider Ms. Monckton a low-level employee.  PI Hr'g Trans. 162, ECF No. 36 (Lando).  Defendant has always received stock options, indicative of her higher level at the company.[3]  *Id.* at 163–64.

Following Ms. Monckton's exit, Lando's team conducted an investigation into what Defendant may have taken from the company but were unable to search her computer before it was wiped clear for use by another employee.  *Id.* at 176–78.  Lando did testify that Defendant had not returned any Veeam documents since her termination.  *Id.* at 178.

### 3. Testimony of Gilbert Lowe

Gilbert Jerome Lowe, formerly a member of the channel team with Defendant, currently holds the position of National Partner Manager.  PI Hr'g

---

[3] The number of stock options Ms. Monckton received and whether she retained these options upon her termination is unclear.

Trans. 31, ECF No. 37 (Lowe). Lowe testified about his role as a member of the channel team and about Veeam's systems. He described the team members' duties as follows: members facilitated sales and the marketing of Veeam products; members put on trainings and other events (with the assistance of Veeam's marketing department), sometimes through the use of whiteboard sessions during which the member would train corporate reseller employees about how to target a market, inform them of the pricing of Veeam's products, and discuss Veeam's product as compared to its competitor's products; members engaged in huddles during which the member would give a five minute pitch to about five to twelve corporate reseller account mangers; and, at times, members were involved in specific deals. *Id.* at 34–37. Lowe interacted with channel partners on a daily basis to keep Veeam "top of mind." *Id.* at 39. To do so, he was expected to know Veeam's pricing, differentiate Veeam's products with competitor products, and facilitate deal closings. *Id.* at 38.

Lowe received Veeam's confidential information on a regular basis in the form of new product releases, sales numbers, battle cards[4], and potential opportunities. *Id.* at 45–46. Veeam employees could also access Veeam's confidential information through the use of salesforce.com. *Id.* at 47–56. That webpage, which is password protected, displays product updates, opportunity forecasts, and other internal communications. *Id.* at 53, 62. Lowe testified that

---

[4] Battle cards are charts that indicate, from Veeam's point of view, how its products compare to other company's products.

he used the webpage "almost daily." *Id.* at 47. Veeam employees also use team.veeam.com, which holds a repository of sales information and documentation. *Id.* at 55–62; *see* PX 13; Rubrik Battle card, PX 17.

He also testified that he was Defendant's "dotted line boss." Pl Hr'g Trans. 66, ECF No. 37 (Lowe).

### 4. Testimony of William Cordero

William Cordero, head of worldwide channels at Rubrik, sets the direction and strategy for sales and hired Defendant to join Rubrik's team. *Id.* at 103–04 (Cordero). He hired her to be Rubrik's channel partner manager for the central region to include all resellers but CDW. *Id.* at 104. He testified that Rubrik has only recently received silver status[5] with CDW. *Id.* at 105. With this status, Rubrik must have a designated CDW representative. *Id.* at 105–06. To meet this demand, Rubrik hired Tim Kirchmeyer to fulfill this role. *Id.* at 106. He started June 1st, 2016. *Id.* CDW is one of Rubrik's two "focus partners," meaning that it is an important strategic partner for Rubrik's business. *Id.* at 108.

Cordero testified to several e-mails that were exchanged regarding Defendant's hiring. *Id.* at 11–113; *see* E-mails, PX 57, PX 58. Cordero asks his employees to have "superficial knowledge" of Rubrik's products and to cover the "business aspects" of marketing. *Id.* at 114, 116–17.

---

[5] Silver status denotes a level of access to CDW's end user network. The "status" of a company with CDW dictates the amount and type of access that CDW provides.

### 5. Testimony of Keeley Monckton[6]

Defendant Keeley Monckton testified that when she worked at Barracuda, before Veam, she was responsible for networking, security, storage, and backup products; she worked with small and CDW "medium-large" business teams; she received new hire training, completed online coursework, and reviewed new businesses; she used salesforce.com and worked to create opportunities for Barracuda. PI Hr'g Trans. 181–83, ECF No. 36 (Monckton). PI Hr'g Trans 71–73, 75, 181, ECF No. 37 (Monckton).

#### a. Ms. Monckton at Veeam

Ms. Monckton stated that she has never worked in a position that required her to recruit new channel partners. PI Hr'g Trans. 273, ECF No. 37 (Monckton). However, at Veeam, she learned the features of Veeam's products, how to sell Veeam's products, and how to use "the channel." She also used Battle cards; she used "team.veeam.com" and "salesforce.com"; she took trainings; and she had access to information regarding price margin, products in development, and pricing of products. *Id.* at 200–14; *see also* PI Hr'g Trans. 74, ECF No. 37 (Monckton). She testified that Veeam does not do business with small companies. PI Hr'g Trans. 183, ECF No. 36 (Monckton).

Ms. Mockton described her day-to-day responsibilities as a channel manager for Veeam as follows:

---

[6]The Court summarizes Ms. Monkton's testimony in full consideration of Plaintiff's prepared chart, in which it summarizes what it sees as inconsistent testimony given by Ms. Monckton at the preliminary injunction hearing.

> They vary depending on if a field seller was coming on site, if we had an event coming up, if we were planning, you know, an end user event would kind of dictate where I would spend my time. Floor walks, following up on . . . a deal, following up with one of the CDW rep if we needed to update or if the field rep couldn't get a hold of them. In the floor walks, passing out, obviously, anything Veeam branded. The big thing is that, again, when nothing else, you walk through the floors, they think of you with your clothes, all that as the brand.

PI Hr'g Trans. 79–80, ECF No. 37 (Monckton). She would take people out to lunch two to three times per week and out to happy hour one time per week. *Id.* at 80. She would assist in the organization of trainings, but she never hosted her own trainings nor provided any trainings. *Id.* at 80–81. Ms. Monkton admitted that when Gilbert Lowe was promoted, she helped take over his responsibilities, which included working in the central region. PI Hr'g Trans. 223, ECF No. 36 (Monckton).

At Veeam, Ms. Monckton only received her total compensation if sales goals were met throughout North America. *Id.* at 224. However, she only worked with the corporate reseller CDW. PI Hr'g Trans. 77, ECF No. 37 (Monckton). No one reported to her. *Id.* at 79. Lowe was her "dotted line boss." *Id.* at 85. Ms. Monckton testified that Lowe told her to stay on through the end of the first quarter of 2016 so that she could get her expenses reimbursed and see out the sales quarter. *Id.* at 87–88.

Her relationship with the corporate reseller CDW "solidified" while working at Barracuda and at Veeam. PI Hr'g Trans. 181–82, ECF No. 36 (Monckton); PI Hr'g Trans. 37, ECF No. 37 (Monckton).

### a. Ms. Monckton at Rubrik

Ms. Monckton testified that she was hired to open other channels to Rubrik and to expand Rubrik's network.  PI Hr'g Trans. 82–83, ECF No. 37 (Monckton). At Rubrik, Ms. Monckton received training on its products, how to make an initial sales pitch on behalf of Rubrik, and about Rubrik's competitors.  *Id.* at 5–6, 8–9. Ms. Monckton's position at Rubrik includes work in the central region of the United States.  *Id.* at 6.  Ms. Monckton admitted that the Rubrik group was a team; if others on the team needed help, she assisted with any communication needs.  *Id.* at 6–7.

Ms. Monckton assisted Mr. Cordero in hiring a CDW sales representative. She testified that she has maintained her relationship with CDW since she started working for Rubrik.  *Id.* at 12.

Ms. Mockton testified that she did not take or print any Veeam materials upon her departure.  *Id.* at 83.  Ms. Monckton claimed that the only information that she gave to Rubrik that was Veeam material was a date of a training session and the Employment Agreement.  *Id.* at 84.  She never provided any materials regarding Veeam's products.  *Id.* at 36–37.

Ms. Monckton testified that she has not looked for a job since this case was filed.  *Id.* at 26.  At the hearing, Ms. Monckton stated: "Well, I would— eventually yes, I could get another job."  *Id.*

The Court also heard testimony regarding Ms. Monckton's communication with Rubrik employees prior to her departure from Veeam.  The Court finds the

messages exchanged between Ms. Monckton and others prior to her departure from Veeam troubling and riddled with evidentiary concerns. However, the Court considers the messages for the proposition that Ms. Monckton communicated with Rubrik employees prior to her departure from Veeam and on the topic of CDW. *See* PX 28, 62, 64, 66. Indeed, Ms. Monckton accepted her new employment on March 14th, ten days before she told Veeam that she was considering leaving. PI Hr'g Trans. 240–41, ECF No. 36.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 65 permits the Court to issue preliminary injunctions upon the satisfaction of certain requirements. The Court considers four factors in determining whether to grant injunctive relief: (1) whether the movant has established a substantial probability of success on the merits; (2) whether the movant would suffer irreparable harm in the absence of an injunction; (3) whether an injunction would substantially harm third parties; and (4) whether an injunction would serve the public interest. *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010). The factors are not prerequisites; rather, they must be balanced in weighing the equities involved. *Capobianco, D.C. v. Summers*, 377 F.3d 559, 561 (6th Cir. 2004).

## III. ANALYSIS

Plaintiff claims that it is entitled to a preliminary injunction enforcing Ms. Monckton's non-competition agreement because there is a substantial likelihood of success on the merits of its claim; Veeam will suffer irreparable

harm without injunctive relief; on balance, the harms weigh heavier against Veeam; and there would be no adverse effect on the public.

Defendant counters that Plaintiff has not met its burden to obtain a preliminary injunction, in part, because it has not shown a strong or substantial likelihood of success on the merits under the standard articulated in *Raimonde v. Van Vlerah*, 42 Ohio St. 2d 21, 25–26 (1975), which requires Plaintiff to prove its case by clear and convincing evidence. Defendant also argues that Veeam has failed to show that it will suffer irreparable harm.

## A. Probability of Success on the Merits

Plaintiff argues that Defendant breached her Employment Agreement, specifically, that she breached the covenant not to compete.

Under Ohio law, to prove a claim for breach of contract, the plaintiff must establish "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage and loss to the plaintiff." *Nilavar v. Osborn*, 738 N.E.2d 1271, 1282 (2nd Dist. Ohio Ct. App. Apr. 7, 2000).

Defendant does not dispute that she left Veeam to work for Rubrik, a competitor, and that she started working for Rubrik within the time frame and geographic area proscribed in the Employment Agreement. Rather, in defending this enforcement action, Defendant contends that the covenant not to compete imposes an unreasonable restriction and is thus unenforceable.

> [A] covenant not to compete which imposes unreasonable restrictions upon an employee will be enforced to the extent necessary to protect the employer's legitimate interests. A covenant

restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public. Courts are empowered to modify or amend employment agreements to achieve such results.

*Raimonde*, 42 Ohio St. 2d at 25–26.  Courts also consider the following factors in

determining a covenant's reasonableness:

whether the agreement contains time and space limitations, whether the employee is the sole contact with the customer, whether the employee has confidential information and trade secrets, whether the agreement seeks to limit only unfair competition, whether the agreement seeks to stifle ordinary competition, whether the agreement seeks to stifle the employee's inherent skill and experience, whether the benefit to the employer is disproportional to the detriment to the employee, whether the agreement bars the employee's sole means of support, whether the skills that the agreement seeks to restrain were actually developed during the employment and whether the forbidden employment is merely incidental to the main employment.

*P&G, Co. v. Stoneham*, 140 Ohio App. 3d 260, 275–76 (1st Dist. Ct. App. Sept.

29, 2000).  Plaintiff must present clear and convincing evidence to show that the

non-compete agreement is reasonable under *Raimonde*.  *See id.* at 276.  The

Court will initially assess the factors enunciated in *Stoneham*.  The Court will then

assess the requisite *Raimonde* elements, in light of its discussion of the factors.

### 1. The *Stoneham* Factors

In Plaintiff's favor, the record demonstrates that Defendant had access to

some proprietary information that surely becomes stale after a reasonable period

of time; she has been in the re-sale business for almost four years with different

companies, half of which she spent at Veeam; Veeam's software upgrades at

least annually; Ms. Monckton took a training on Veeam's most recent version of its software on February 2016; and the enforcement of the agreement would not stifle Defendant's inherent skills in sales because she could work in direct sales or in small-business re-sale, rather than in corporate re-sale.

On the other hand, the record also demonstrates that the enforcement of the agreement would destroy Defendant's current means of support; her talents and knowledge in the area of sales were first developed during her employment with Barracuda; no one reported to Defendant when she worked at Veeam; she was one of seven members of a team; that she worked for Veeam for thirteen months; and she only took a handful of trainings while at Veeam.

The geographic limitation of North America is unreasonable regardless of how Veeam defines itself. While the nature of the industry—global software sales by worldwide companies—and the nature of the work that Veeam's employees perform—representing Veeam to the largest corporate reseller in North America, the record does not reflect that Ms. Monckton was more than a minor player as she was a member of a team, only worked with one corporate reseller, and her time at Veeam was short.

The record also reflects that prohibiting Ms. Monkton's employment at Rubrik does little to limit unfair competition. Many of Plaintiff's trainings contain information that is made available to its corporate resellers—nearly 10,000 companies and their employees, whom are not subject to a non-compete clause. In addition, while there may have been unfettered access to "team.veeam.com"

and "salesforce.com," there is no evidence that Ms. Monkton set the prices of

Veeam's products nor is there evidence that she masterminded any of Veeam's

sales deals. Ms. Monkton's involvement with clients was limited to soliciting

CDW representatives on behalf of Veeam and conversing with these individuals

about Veeam's products. Ms. Monckton *responded to* requests by others at

Veeam to coordinate meetings, set up trainings, and facilitate discussions. She,

apparently, did this quite well and kept CDW's "mind share" on Veeam.

However, Ms. Monckton did not maintain a personal list of clients, and she did

not plan the "opportunities," both of which may have led the potential for unfair

competition. *See, e.g.*, *FirstEnergy Sols. Corp. v. Flerick*, No. 5:12-CV-2948,

2012 WL 6649201, at *3 (N.D. Ohio Dec. 20, 2012), *aff'd*, 521 F. App'x 521 (6th

Cir. 2013) (enforcing a non-compete clause where "[t]estimony revealed that

Defendant maintained his own 'book' of clients, thus appearing to be the sole

contact between the company and the customers."); *UZ Engineered Prods. Co.

v. Midwest Motor Supply Co., Inc.*, 147 Ohio App. 3d. 382, 389 (10th Dist. Ohio

Ct. App. Dec. 20, 2001) (enforcing a non-competition clause signed by company

decision-makers and recruiters, as well as others).

  The above consideration of the factors favors a finding that the

Employment Agreement is unreasonable. The Court now assesses the

*Raimonde* elements.

### 2. The *Raimonde* Elements

#### a. Whether the provision is no greater than is required for protection of the employer

On this element, the Court finds Plaintiff's arguments do not carry the day. *See* Mot. 10, ECF No. 1-3; Pls.'s Post-Hr'g Br. 5, 9, ECF No. 44.  Plaintiff overstates the training Ms. Monckton received.  Indeed, much of the training she received is now public information.

Plaintiff avers that it will lose its competitive advantage because Defendant had access to the "opportunities" in its "pipeline" and information about its 2016 products.  First, Plaintiff did not identify those opportunities, and it is not convincing that the largest forthcoming deals of a software company that purports to compete globally are so secret that to restrict a single corporate reseller protects the company's competitive advantage.  Second, Defendant was not a software developer nor was she an engineer with knowledge of the specifications of Defendant's latest software.  Restraining her from working for Rubrik is not needed to protect the integrity of Veeam's product line.  It is no secret that Veeam has an upgraded, 2016 version of its software.

#### b. Whether the provision imposes undue hardship on the employee

There appears to be a high likelihood that Ms. Monckton would be able to find another job in the IT industry or in sales.  For example, she held a position in direct sales prior to her position with Barracuda.   PI Hr'g Trans. 70–71, ECF No. 37 (Monckton).  Thus, the Court finds that Plaintiff has prevailed in showing that

the provision does not impose undue hardship on Ms. Monckton.

### c. Whether the provision is injurious to the public.

In this circumstance, the Court finds that the provision is not injurious to the public, in large part because back-up software will continue to be sold and used to protect the public's data and also, in part, because even while at Veeam, Ms. Monckton was one of six or seven employees in Veeam's corporate reseller team, meaning that there are at least five or six other individuals employed at Veeam that can complete her job.

On the whole, the Court finds Plaintiffs have failed to carry their burden of showing a substantial likelihood of success on the merits. Specifically, Plaintiff has failed to sufficiently show a substantial likelihood of satisfying the first *Ramoinde* element by clear and convincing evidence. The Court is not convinced that the Employment Agreement is no greater than is required to protect Veeam.

### B. Irreparable Harm

#### 1. Harm to Veeam

Absent an injunction, Veeam argues it will continue to suffer irreparable harm due to the real and immediate threat of disclosure of its trade secrets and confidential information, the loss of fair competition, and the loss of customer good will. Mot. 12, ECF No. 1-3.

Defendant argues that Plaintiff has failed to show any actual or imminent harm. Resp. 8, ECF No. 15. Defendant specifically argues that Plaintiff's use of

the inevitable disclosure rule strains it beyond its breaking point.

> "According to the inevitable-disclosure rule, a threat of harm warranting injunctive relief can be shown by facts establishing that an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment." [*Stoneham*] at 274, 747 N.E.2d 268.

> "Inevitable disclosure is not a concept limited to the law of trade secrets and misappropriation. Thus, for example, the courts have recognized that 'it is very difficult for the human mind to compartmentalize and selectively suppress information once learned, no matter how well intentioned the effort may be to do so.' *FTC v. Exxon Corp.*, 636 F.2d 1336, 1350 (D.C. Cir. 1980); *see also Sullivan Marketing, Inc. v. Valassis Comm., Inc.*, 1994 WL 177795, at *3 (S.D.N.Y.1994). Those cases recognize that, once a person has knowledge of a competitors [sic] business information, when they are called upon to act on behalf of his own company, his ability to compartmentalize the knowledge of his competitor's been [sic] is 'nigh impossible.' *Sullivan*, 1994 WL [177795], at *3." *PepsiCo, Inc. v. Redmond*, (N.D. Ill. Jan. 2, 1996) No. 94 C 6838, 1996 WL 3965.

*Dexxon Digital Storage, Inc. v. Haenszel*, 161 Ohio App. 3d 747, 755–56 (5th

Dist. Ohio Ct. App. June 20, 2005).

The Court finds Defendant's argument well taken. Plaintiff has not

demonstrated that the inevitable discovery rule applies to the circumstances of

this case. Defendant was responsible for a portion of Veeam's visibility to its

corporate resellers and has knowledge of Veeam's sales process and product;

she was not responsible for compiling this information and data. Defendant

would have been exposed to the information, to be sure. However, the

information is, in part, now public knowledge, and in part, shared with 10,000

companies' employees. Further, given the diversity of her job duties, which

included connecting Veeam with CDW, promoting Veeam products, taking up CDW "mind share" as well as filling in other positions and performing work in Veeam's industry-specific, "vertical" spaces, it is simply not reasonable to conclude that she would have retained in detail the information she read or she received through training. *Cf. Fifth Third Processing, Solutions, LLC v. Elliot*, No. 1:11–CV–247, 2011 WL 4946330, at \*8 (S.D. Ohio Oct. 18, 2011). Now, several months after the termination of her employment from Veeam, it is less likely that she has retained detailed knowledge of Veeam information and can use that to harm Veeam. Further, Mr. Burgman testified that Veeam's sales are "on a roll" with CDW, at least in part, because others have "cover[ed] all the things that [Ms. Monckton] was covering." Pl Hr'g Trans 147, ECF No. 36 (Burgman).

In sum, the Court finds this factor weighs against enforcement.

## C. Harm to Third Parties

The Court finds this factor neutral. Ms. Monckton was part of a team, and there is no evidence that her absence has affected software backup availability. Under the Employment Agreement, Defendant is not prohibited from working in sales in any other industry or in the computer industry, so long as it is not for a company that competes with Veeam. *See* Mot. 14, ECF No. 1-3 (pointing out the same). And, it appears that Ms. Monckton could likely find work in sales. However, her employment with Rubrik is currently her sole source of employment, and a preliminary injunction will preclude Ms. Monckton from continuing her employment with Rubrik.

### D. Public Interest

Plaintiff argues that courts consistently recognize that there are overriding public interests in ensuring competitors in the marketplace compete in a manner that is lawful, and an injunction would promote the public interest in protecting the validity of contracts, protecting confidential information, and ensuring fair competition. Mot. 14, ECF No. 1-3. Plaintiff avers that because Rubrik can continue to compete against Veeam even with an injunction from this Court, there is no loss of business competition that might otherwise adversely affect the public. *Id.* at 15. In response, Defendant argues that public policy supports a finding that a clause such as the one in the Employment Agreement should not be enforced. Resp., ECF No. 15; Def.'s Post-Hr'g Br., ECF No. 43.

The Court finds this factor neutral. The public interest is served by having reasonable non-competition agreements enforced and preventing unfair competition. *Post-Browning, Inc. v. Knabe*, No. 14CV857, 2015 WL 5719580, at *4 (S.D. Ohio Sept. 30, 2015). However, it is also served by ensuring that an individual's employment opportunities, especially a non-managerial employee's opportunities, are not unduly restrained. *See id.*

On balance, at this stage of the case, the equities do not favor granting a preliminary injunction to enforce the Employment Agreement. The Court makes this determination based solely on the facts presented at the hearing and with the benefit of the opportunity to consider witness testimony and credibility.

## IV.    CONCLUSION

Accordingly, the Court **DENIES** Plaintiff's motion for a preliminary injunction.  The Court lifts the temporary restraining order placed on Defendant. Defendant may resume her employment with Rubrik, under the job responsibilities enunciated at the hearing.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**